IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| AMANDA HELEN TAYLOR, | ) | |
| | ) | No. 39380-1-III |
| Appellant, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| TODD EMERY TAYLOR, | ) | |
| | ) | |
| Respondent. | ) | |

FEARING, C.J. — Amanda Taylor appeals from the superior court's denial of a

protection order she sought against her former husband. Because Taylor's appeal

primarily questions the superior court's determination of credibility of the parties, we

affirm.

FACTS

This appeal entails the relationship between former spouses Amanda and Todd

Taylor. In September 2021, Amanda Taylor initiated a proceeding to dissolve her

marriage with Todd. The Taylors have two children, C.T. and L.T. C.T. was 13 years

old and L.T. was 11 years old in September 2021.

In January 2022, Amanda Taylor filed a motion for a temporary family law order

removing Todd from the family home. The dissolution court granted the motion and

afforded Todd thirty days to move from the house. The Taylors finalized the marital

dissolution in August 2022.

This appeal concerns the denial of a petition seeking a protection order, which

Amanda Taylor filed in October 2022. In the petition, Amanda complained of

controlling behavior by Todd before and after she filed the marital dissolution. In her

petition, Amanda averred:

> I am afraid of how Todd may react in response to this request [for a protection order], towards the [children] and/or myself. This is based on the prior CPS situation with [L.T.] after I filed for divorce, and the threatening behavior from Todd towards myself related to the order for him to move out of the house. I am also afraid of the ongoing physical outbursts from [L.T.] towards myself and [C.T.] after contact with Todd.
> . . . .
> I have been afraid of Todd's actions for several years and I continue to be afraid of his actions on a daily basis. Our children, [C.T.] and [L.T.], are also afraid as well. . . As Todd's behavior continued after the finalized divorce documents, I reached out to the YWCA domestic violence program for help. This is where I learned about the Power and Control Wheel that identifies different forms of abuse, and also about the concept of coercive control.
> Physical aggression or threats of physical aggression directly from Todd happen occasionally. When discussing his own medical condition back in 2020, he talked about how I couldn't cope with the pain if he hit me across the stomach, smashed both my hands with a hammer, and alternated sharp pokes with fire on my feet . . . About three months later in February of 2022, we had the hearing [to remove Todd from the home]. I was not given a link to attend the hearing, but Todd ended up with 30 days to move out. When Todd arrived back at the house that same evening of the hearing, he stood directly behind me while I was doing dishes. In a low voice, he commented "well, that sure went in your favor." I was very scared and did not respond. Then later that night, I was starting to fall asleep on the couch. Todd walked upstairs and stood about two feet from the couch in the dark living room staring at me. He did not say anything,

2

but continued to stand there for several minutes. My heart was beating out of my chest, and I did not know if he was going to do something or not. He ended up going back down the stairs. . .

The verbal and emotional abuse happens very frequently. Prior to filing for divorce in September of 2021, Todd would frequently make humiliating and degrading comments toward me. He would tell me things like I was selfish, stupid, couldn't manage money, I wasted time, I was disorganized, have bad anxiety, and [was] dirty. When I tried to explain how I was doing the best I could, he would say it was a "pity party for Amanda," "you never cared about anyone else," or I would "let him suffer while I went and did fun things with the kids." . . . [W]hen I mentioned not being invited on a weekend trip he said "maybe if you behaved then you could go too." Shortly after I filed for divorce in September of 2021, the way Todd communicated these types of things started to shift. Todd directed some of them towards [C.T.] and [L.T.] instead. . . . Todd also added saying things to [L.T.] such as "you are the reason your mom and I are getting divorced." And "your mom and sister love their friends more than you." These types of comments would send [L.T.] into emotional distress to the point where she acted out physically. She would hit, punch, kick, and slap me. She would also kick doors and walls and throw objects. . . .

After Todd moved [from the family residence], he kept using [L.T.] as a way to continue the abuse. The degrading comments he made to [L.T.] continued. . . I hoped this situation would stop after the divorce paperwork was completed. However, it did not. The pattern is the same. Todd reaches out to [L.T.] through phone call and/or text message. . . . [L.T.] becomes upset to the point of hitting, kicking, punching, slapping, and pulling my hair. She has left visible bruises on my arms and legs, punched my head so hard with her fists I have a headache overnight, and grabbed my arm and pulled me to the ground. . . .

. . . .

In addition to the physical incidents, Todd uses his phone to take videos when he is made [sic] and threatens to use those videos against me.

. . . .

Todd will frequently blame me for keeping the kids away from him.

. . . .

I am in constant fear with everything I do or don't do, and how Todd will use that against me. This fear is directly related to past threats and actions from Todd. . . .

> . . . .
> Todd has also taken actions to isolate me from others. . . .
> Other types of non-physical abusive behaviors by Todd include removing and withholding joint personal belongings. . . .
> Another primary way Todd maintains coercive control is through financial exploitation. He frequently withholds, deceives, or lies about financial information for his own personal gain. . . . [B]y May of 2019, I found out that Todd had opened his own individual checking account and transferred his direct deposit there instead. . . .
> . . . .
> Since 2019, Todd threatened many times that he could get a divorce at any time, and he could also force a sale of the house (text message attached dated 12-11-19). . . .
> . . . .
> The financial abuse goes well beyond just the house, though. When Todd submitted his pay stub with the divorce response in 2021, I also realized he had opened a new additional retirement account through his employer at some point–likely back in 2019.
> . . . .
> I have spent the last three years living in fear. Despite living in separate places and the divorce being final, Todd has continued the physical, verbal, emotional, and financial abuse. . . .

Clerk's Papers (CP) at 9-27.

In a declaration opposing the petition for a protection order, Todd Taylor avowed:

> I feel the case should be dismissed as I do not pose any danger to the children or Amanda. I love my children and put an emphasis on providing them as much love and support as I can. I have had very limited interaction with Amanda since the divorce was final and plan to have even less moving forward.
> I believe it is important to mention that the court has already heard the majority of the matters being presented in this petition, and no restraining order has been filed as a result of those proceedings. A protection order was not requested or ordered on the Temporary Family Law Order filed 2/23/22. A protection order was not requested or ordered on any of the final divorce decree paperwork filed 8/22/22.

4

. . . I have no interest in seeing, speaking with, or communicating with Amanda unless it is absolutely necessary for the children. The current parenting plan requires that I pick up both children directly from their schools and drop them off back at their schools, when school is in session, which has been the case since our divorce was final. I am currently required to pick up and drop off at Amanda's residence when school is not in session, but I stay in the driveway, the children get in my vehicle, and we leave. Amanda has typically remained in the residence during these exchanges, so there has been very limited contact.

. . . .

As I read through the petition, my understanding is the current petition asks for a protection order for Amanda and both children to prevent physical harm. The petition references the same emergency room visit / CPS case that was heard by the court during the 2/23/22 Temporary Family Law order in our divorce case 21-3-01772-32. As mentioned during those proceedings, CPS has never contacted me or my attorney about any case involving me. No restraining order was ordered as a result of those proceedings. I noticed in the paperwork served on me, the After Visit Summary from the emergency room Visit for [L.T.] on 11/21/21, provides the Diagnosis as a "contusion of fifth toe of left foot." I am not a doctor, but my understanding is this means a bruised toe. Filing a protection order against me for a bruised toe an entire year after it occurred, insinuating that it was my fault the child's toe got bruised seems ridiculous to me. I did not know about the "injury" or even find out about the emergency room trip until the insurance statement was mailed to me. And as stated in my previous declaration filed 2-17-22, [L.T.] and I spent time together the evening after the emergency room trip, playing games and having fun. If there was a legitimate concern for the child's safety, why did Amanda allow the child to spend the following evening with me alone, and why was the child so willing to do so? [L.T.] did not even mention the emergency room visit from the previous day. The whole situation has been completely taken out of context in the way Amanda has presented it. . . . I have never intentionally hurt any child. As previously mentioned, I can provide multiple declarations from individuals who have spent time with me and [L.T.], all of which will support my claim that I have no intention of hurting anyone.

I can't comment to incidents between Amanda and the kids since I was not there, but I am concerned to learn there have been multiple

5

physical alterations involving Amanda and [L.T.]. I agreed to counseling for the children in the divorce decree.

. . . .

Regarding the stalking behavior restrictions, the only video that is in question is the one Amanda had the children take of me, and the transcript Amanda made from it. The video seemed strange at the time since the children appeared to be coached on items to video, some of which seem to be missing from the provided transcript such as the girls checking the expiration dates on items in my freezer and fridge. I feel they must have been coached because they made a big deal about some items that I had put in freezer bags stating the food was expired. I had to point out the date was written with a sharpie marker by me, and was the date I put the items in the freezer, not the date the food goes bad. My impression was they were instructed to check for dates on items and didn't completely understand what they were looking for.

Regarding comments about speaking to the children regarding the court case, I am not trying to speak on court proceedings, but I must admit it is difficult to explain to the children why four Sheriff deputies arrived at my apartment to serve the paperwork for this case on me during my weekend with the children. I tried to explain that they had paperwork to give me and that I was going to my bedroom to read it. Of course they had questions. I did my best to avoid them and just say I can't discuss it, sorry. I had the same experience when I was required to move from the home during our divorce proceedings. I tried to explain that I had to move, and was told by [L.T.] that she did not want me to. I responded by explaining that I didn't have a choice, but I would spend time with her as soon as I found a place to live, which only prompted concern about where I was going to stay. Not my finest moment for sure, but it was not an attack on Amanda, it was just a difficult scenario to work through and explain. I never would have imagined that a year later, I am back in court trying to defend my character on what I said when I was removed from my own home, through no fault of my own.

. . . I am not physically hurting anyone. I have no desire to communicate with Amanda unless I need to for the children. Contrary to the information Amanda provided in this case, I approach being a father much as I approach life. I encourage learning and looking for new ways to complete tasks. I don't encourage my children to be mean to their mother, just the opposite. Much like I stated in the video transcript provided by Amanda in the case, I suggested to my children they should make the most

6

of the weekend and have a good one. I love my children and dedicate most
of my free time to them. I am not an angry or violent person.

CP at 129-134.

PROCEDURE

On October 19, 2022, Amanda Taylor filed her petition for a domestic violence

protection order against Todd Taylor. Amanda named herself, C.T., and L.T. as the

persons to be protected by the order. Documents attached to the petition included a

statement by Amanda, a statement by a family friend, a summary of one of L.T.'s doctor

visits, a summary of one of Amanda's doctor visits, emails between Amanda and her

attorney, the declarations Amanda and Todd submitted in February 2022 regarding the

motion to evict Todd from the family home, a copy of the February order, and

screenshots of text message conversations between Amanda and Todd and between

Amanda and the children.

Todd Taylor filed a declaration in opposition to the petition for the protection

order on October 31, 2022. Amanda Taylor filed a reply declaration on November 2.

The superior court conducted a hearing on the petition for the protection order on

November 21, 2022. At the beginning of the hearing, Amanda Taylor asked the trial

court if it wished copies of the statutes and cases she planned to rely on in her argument.

The court declined but stated that it would ask for copies of the authorities if need be.

7

No. 39380-1-III,
*Taylor v. Taylor*

Amanda proceeded to argue that Todd committed domestic violence by way of coercive control.

At the conclusion of the November 21 hearing, the trial court denied the petition. The trial court commented:

> Within the context of domestic violence, of course, I've considered whether there's evidence of domestic violence in terms of evidence of bodily injury, bodily harm, assault, *or whether there's evidence of coercive control,* whether there's evidence of unlawful harassment, whether there's evidence of stalking. . . .
>  . . . .
> And so on one set of circumstances I'm evaluating with victims of domestic violence, even with counsel, if there's evidence that that person is afraid of consequences, if they're afraid for reprisal, it could be reasons why things don't come forward. Alternatively, in terms of a family law action, it certainly happens as well that individuals can be upset about how things go and consequently they're looking for retaliation. There's a number of things that can really explain this set of circumstances.
> What I have a duty to do is evaluate this evidence and apply it to, of course, the legal standard of preponderance of the evidence. So, I'm looking for is there more likely than not or a preponderance of the evidence that supports any facet of domestic violence.
> In terms of the allegations, there are a lot of allegations . . . that Mr. Taylor will make statements, primarily to [L.T.] but sometimes to [C.T.], and they are provocative allegedly in nature. They're inciteful. [L.T.] becomes upset. And then recent behavior would be that [L.T.] is taking out her frustration on her mom by hitting you, slapping you, all sorts of different inappropriate responses. And so, of course, I'm trying to discern whether I find there's evidence to support that Mr. Taylor is doing that or whether there is other plausible explanations for that type of behavior.
> And, in terms of a situation like I have before me where I have, Ms. Taylor, you telling me one set of circumstances, and Mr. Taylor telling me another set of circumstances, and Mr. Dudley [Todd Taylor's counsel] argued at length Mr. Taylor's perspective, I look for when I have Mr. Taylor denying these allegations and indicating that he's a victim of power and control, I'm looking for what evidence do I have to support one party's

8

claims over the other. Right now I have your word, Ms. Taylor, over Mr. Taylor's word.

*So, I look for is there, for instance, extrinsic or outside evidence that could be supportive of one party's position. While certainly we can have a claim made to child protective services, or a claim made to a physician, I'm looking for is there evidence that would warrant an investigation. Namely, for instance, in terms of a child protective service's claim, I would see evidence that they're investigating or that there's a report that it was either founded or unfounded, and as I looked through all the evidence I don't have that report. I have the allegations, but I don't have a report. And while the child was taken in for allegations of assault, in terms of whether or not her foot or ankle was slammed in the door and those kind of things, ultimately the doctor's findings were a contusion on the toe. Contusion of course is bruising. So, I don't have evidence exactly of what happened.*

And while hearsay is admissible, I'm also evaluating what weight to give that. I have a 14-year-old child, a 12-year-old child, and I have allegations from you, Ms. Taylor, as what they're saying, but I don't have any additional information. *I'm looking for do I have for instance disclosures to a school counselor, or do I have disclosures to a teacher, or a physician in terms of things that seem to be genuine in nature about their assessment of credibility.*

I, of course, as everyone knows, *I don't have any of those kind of reports*, so I'm back to Ms. Taylor what you told me and what Mr. Taylor has told me. So, it comes down to ultimately credibility.*

I don't find, in this instance, that there's evidence that Ms. Taylor you were reluctant to make these statements during the course of the dissolution for the reasons I have indicated because in fact in those emails there's information exchanged between you and Ms. Deonier [Amanda's attorney]. Some of those were brought to light in brief litigation and some of those didn't go any further. I don't know the ultimate reasons about the strategy behind if it didn't come forward, but the Court, to the extent it was litigated, didn't make any particular findings that led to restrictions.

*There was one statement that I read and this is in, Ms. Taylor, your narrative where you had alleged that Mr. Taylor back in 2020 talked about how you couldn't cope with the pain if he hit you across the stomach with a baseball bat, smashed both your hands with a hammer, and alternating sharp pokes with fire on your feet. You presented that as an example of physical aggression or threats of aggression that would happen occasionally.*

9

As I've said, *I looked at all the emails including that email*. So, that statement isn't the only statement in conjunction. There is, of course, two pages of text pages, and I read it in its entirety. Perhaps not real artful. Don't mean to be critical.

*But, in terms of the narrative, that wasn't conveyed by Mr. Taylor as a threat but instead upon reading the two-page narrative and the text, it was really clear to this Court Mr. Taylor was conveying how he felt emotionally and the pain that he felt not just from lack of sleep and those kind of things but otherwise.* And so *that wording was in context of trying to give you perspective as to how he felt.* It wasn't the fact that he was going to do that. Clearly, it was instead a statement that a way to convey this is what it would be like if you suffered that kind of pain, the pain I'm feeling, and then, of course, he closes with that it would take that for there to be any real reasonable conversations. Otherwise, if you don't agree with that perspective, then sign the papers and they can both move on.

So, when I consider that, *it's concerning to me that that lacks credibility for the Court because it wasn't a threat.* It wasn't him threatening to do those things but instead, of course, it's in the context of conveying his feelings and telling in his own words this is what it would be like if this happened to you that's the level of pain that I'm feeling. "I" meaning Mr. Taylor. So, that affects my assessment in terms of credibility.

So, *I don't find that I have sufficient evidence by a preponderance of the evidence that leads me to conclude that there's been domestic violence, unlawful harassment, coercive control, stalking, or otherwise. So, for those reasons, I'll be denying the petition today.*

Report of Proceedings (RP) at 21-27 (emphasis added).

## LAW AND ANALYSIS

On appeal, Amanda Taylor complains that the superior court erroneously assessed the credibility of the parties and, in particular, relied on misleading evidence presented by Todd Taylor. She next complains that the superior court applied the wrong legal standard when denying her petition for a protection order. Finally, she contends that the superior court refused to review the case law she wished to present to the court.

10

Witness Credibility

Amanda Taylor argues that the trial court erred in analyzing the parties' credibility because it relied on discrete incidents of behavior instead of a pattern of behavior and relied on misleading, biased statements. This court defers to the trier of fact on the persuasiveness of the evidence, witness credibility, and conflicting testimony. *In re Knight*, 178 Wn. App. 929, 937, 317 P.3d 1068 (2014). The law does not require any particular methods by which a trial court assesses credibility.

Because we defer to the superior court's findings of credibility, we do not review all of the examples forwarded by Amanda Taylor of comments from the trial court that suggest error in the court finding Todd Taylor as more credible. We give two instances.

Amanda Taylor asserts that the trial court explained to her, on the date she filed the petition, that she did not qualify for an immediate protection order because nothing significant had happened since the parties' divorce. Amanda maintains that, by denying an immediate protection order, the trial court acted in conflict with RCW 7.105.225(2)(e), which provides:

> [t]he court may not deny or dismiss a petition for a protection order on the grounds that: . . . [t]he conduct at issue did not occur recently or because of the passage of time since the last incident of conduct giving rise to the petition.

11

No. 39380-1-III,
*Taylor v. Taylor*

Nevertheless, a denial of an immediate protection order based on the lack of recent alleged domestic violence does not equate to denying the underlying petition for the protection order.

Amanda Taylor argues that the trial court abused its discretion when analyzing the parties' credibility because it focused on specific text messages and did not understand that the text messages were part of a larger pattern of coercive control. She cites the following portion of the superior court's ruling as support for this argument:

> There was one statement that I read and this is in, Ms. Taylor, your narrative where you had alleged that Mr. Taylor back in 2020 talked about how you couldn't cope with the pain if he hit you across the stomach with a baseball bat, smashed both your hands with a hammer, and alternating sharp pokes with fire on your feet. You presented that as an example of physical aggression or threats of aggression that would happen occasionally.
>
> As I've said, I looked at all the emails including that email. So, that statement isn't the only statement in conjunction. There is, of course, two pages of text pages, and I read it in its entirety. Perhaps not real artful. Don't mean to be critical.
>
> But, in terms of the narrative, that wasn't conveyed by Mr. Taylor as a threat but instead upon reading the two-page narrative and the text, it was really clear to this Court Mr. Taylor was conveying how he felt emotionally and the pain that he felt not just from lack of sleep and those kind of things but otherwise. And so that wording was in context of trying to give you perspective as to how he felt. It wasn't the fact that he was going to do that.

RP at 25-26. Amanda does not elaborate on how the trial court mistakenly assessed credibility based on this passage.

12

The trial court could reasonably question Amanda Taylor's credibility based on many factors. She did not seek a protection order during the marital dissolution proceeding. Amanda argues that she did not fully understand the control exerted by Todd Taylor during this time, and we recognize that sometimes the victim of coercive control does not understand its nature until years later. Still, the superior court could reasonably conclude otherwise. Amanda claimed that CPS investigated an injured foot of one of the daughters. But CPS found no abuse. Amanda suggested that Todd impliedly threatened to beat her with a baseball bat, when Todd only suggested that he felt like someone beat him with a bat.

Legal Standard

Amanda Taylor argues that the trial court, when assessing coercive control, employed a mistaken standard that demanded objective evidence of physical assault severe enough to warrant an investigation. Nevertheless, other than citing the portion of the record where she believes the court articulated the alleged incorrect standard, Amanda does not further discuss the trial court's analysis.

RCW 7.105.010 defines "domestic violence" for purposes of a protection order:

> (9) "Domestic violence" means:
> (a) Physical harm, bodily injury, assault, or the infliction of fear of physical harm, bodily injury, or assault; nonconsensual sexual conduct or nonconsensual sexual penetration; *coercive control*; unlawful harassment; or stalking of one intimate partner by another intimate partner; or
> (b) Physical harm, bodily injury, assault, or the infliction of fear of physical harm, bodily injury, or assault; nonconsensual sexual conduct or

13

nonconsensual sexual penetration; *coercive control*; unlawful harassment; or stalking of one family or household member by another family or household member.

(Emphasis added.)  RCW 7.105.010 defines "coercive control" as:

(4)(a) "Coercive control" means a pattern of behavior that is used to cause another to suffer physical, emotional, or psychological harm, and in purpose or effect unreasonably interferes with a person's free will and personal liberty.  In determining whether the interference is unreasonable, the court shall consider the context and impact of the pattern of behavior from the perspective of a similarly situated person.  Examples of coercive control include, but are not limited to, engaging in any of the following:
(i) Intimidation or controlling or compelling conduct by:
(A) Damaging, destroying, or threatening to damage or destroy, or forcing the other party to relinquish, goods, property, or items of special value;
. . . .
(E) Communicating, directly or indirectly, the intent to:
(I) Harm the other party's children, family members, friends, or pets, including by use of physical forms of violence;
. . . .
(H) Engaging in sexual or reproductive coercion;
(ii) Causing dependence, confinement, or isolation of the other party from friends, relatives, or other sources of support, including schooling and employment, or subjecting the other party to physical confinement or restraint;
. . . .
(iv) Controlling, exerting undue influence over, interfering with, regulating, or monitoring the other party's movements, communications, daily behavior, finances, economic resources, or employment, including but not limited to interference with or attempting to limit access to services for children of the other party, such as health care, medication, child care, or school-based extracurricular activities;
. . . .or
(vi) Engaging in psychological aggression, including inflicting fear, humiliating, degrading, or punishing the other party.

Amanda Taylor relies on the following language from the trial court's ruling to argue that the court used the wrong standard:

> [THE COURT:] . . . Right now I have your word, Ms. Taylor, over Mr. Taylor's word.
>
> So, I look for is there, for instance, extrinsic or outside evidence that could be supportive of one party's position. While certainly we can have a claim made to child protective services, or a claim made to a physician, I'm looking for is there evidence that would warrant an investigation. Namely, for instance, in terms of a child protective service's claim, I would see evidence that they're investigating or that there's a report that it was either founded or unfounded, and as I looked through all the evidence I don't have that report. I have the allegations, but I don't have a report. And while the child was taken in for allegations of assault, in terms of whether or not her foot or ankle was slammed in the door and those kind of things, ultimately the doctor's findings were a contusion on the toe. Contusion of course is bruising. So, I don't have evidence exactly of what happened.
>
> And while hearsay is admissible, I'm also evaluating what weight to give that. I have a 14-year-old child, a 12-year-old child, and I have allegations from you, Ms. Taylor, as what they're saying, but I don't have any additional information. I'm looking for do I have for instance disclosures to a school counselor, or do I have disclosures to a teacher, or a physician in terms of things that seem to be genuine in nature about their assessment of credibility.

RP at 23-24. This portion of the superior court's ruling does not suggest that the trial court employed a standard that required objective evidence of physical harm severe enough to warrant an investigation when analyzing coercive control. Instead, the court explained that it needed to find domestic violence by a preponderance of the evidence and, because neither party submitted evidence other than declarations and records of communications between them, the court needed to weigh Amanda's word versus Todd's word.

15

The superior court's ruling recognized the legislature recently added coercive control as a basis for a protective order. Nothing in the ruling suggests the court failed to understand the nature of coercive control as defined in RCW 7.105.010(4).

Case Law

Finally, Amanda Taylor argues that the trial court erred because it failed to ask for copies of cases she used in her argument and failed to cite those cases in its decision. Taylor cites no authority that requires a trial court to accept copies of cases that a party seeks to hand the court during a hearing.

The three cases Amanda Taylor sought to present to the superior court were *State v. Nguyen*, 10 Wn. App. 2d 797, 450 P.3d 630 (2019), *State v. Abdi-Issa*, 199 Wn.2d 163, 504 P.3d 223 (2022) and *State v. Becklin*, 163 Wn.2d 519, 182 P.3d 944 (2008). Nevertheless, those cases help none in determining whether domestic violence took place through coercive control. *State v. Nguyen* concerned the sufficiency of evidence supporting a felony stalking conviction. *State v. Abdi-Issa* addressed whether animal cruelty is a form of domestic violence. *State v. Becklin* concerned a felony stalking charge and statutory interpretation of a stalking statute.

CONCLUSION

We affirm the trial court's denial of Amanda Taylor's petition for a domestic violence protection order.

16

No. 39380-1-III,
*Taylor v. Taylor*


A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

_____
Fearing, C.J.

WE CONCUR:


_____
Lawrence-Berrey, J.

_____
Cooney, J.

17